**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **NOLAN WATSON (R25806),** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | No. 24 50001 |
| | ) | |
| **ANDREA TACK, and SARAH** | ) | Judge Rebecca R. Pallmeyer |
| **RODRIGUEZ,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

For the reasons explained below, Defendants' motion for summary judgment [164] is granted. The Clerk is directed to enter judgment in favor of Defendants and against Plaintiff. Defendants' motion for sanctions [140] is also granted, and the court refers this case to the Executive Committee with a recommendation that it impose filing restrictions on Plaintiff Watson.

## BACKGROUND

Plaintiff Nolan Watson, an Illinois state prisoner, filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 in December 2023. Plaintiff claims that Defendant Sarah Rodriguez[1] ("Rodriguez") retaliated against him for filing grievances, and that Defendant Warden Andrea Tack ("Tack") "turned a blind eye" to the alleged retaliation. Defendants have moved for summary judgment. Plaintiff responded to Defendants' motion for summary judgment and Defendants have replied.[2] For the reasons discussed below, the Defendants' summary judgment motion is granted.

---

[1]    The court notes that Ms. Rodriguez's name is misspelled in the case caption as Rodriquez. The court uses the spelling that appears in her Declaration [165-12].

[2]    The court notes that Defendants' Reply Brief appears to be incomplete in that the word "DESCRIBE" appears on pages 1 and 2, and the brief omits a reference to an exhibit on page 6. (*See* Reply [183] at 1, 2, and 6.) The court will not require re-filing, as the omissions are minor and the briefing on both sides is otherwise comprehensive. Further, much of Defendants' brief responds to Plaintiff's arguments in his summary judgment response, which are focused on the allegations in the *fourth* amended complaint (not the operative third amended complaint (*see* fn. 4 below).) Thus, Defendants have submitted certain video footage from November 23, 2023 (*see* Exhibits [182]) in connection with their reply brief. Plaintiff cited to this video footage in his

## I.      Northern District of Illinois Local Rule 56.1

This court's Local Rule 56.1 governs the procedures for filing and responding to motions for summary judgment. Rule 56.1 requires the party moving for summary judgment to provide a statement of material facts consisting of "concise numbered paragraphs", each of them including a "citation to the specific evidentiary material, including the specific page number, that supports it." Local Rule 56.1(d). The party opposing summary judgment responds by admitting or disputing the moving parties' account, citing "specific evidentiary material" for any disputed fact. Absent such specific citations, the moving parties' "[a]sserted facts may be deemed admitted." Local Rule 56.1(e)(3).

Defendants in this case filed a Rule 56.1 statement of material facts [165] in support of their motion and, consistent with Local Rules, Defendants also provided Plaintiff, who is unrepresented, with a Local Rule 56.2 Notice, which explains what Local Rule 56.1 requires of a litigant opposing summary judgment [167]. Plaintiff Watson has responded to Defendants' statement of facts [177], and has submitted a memorandum of law [176] and an additional response to the summary judgment motion [175], as well as a statement of additional facts [178]. The court construes his *pro se* submissions liberally, *see Thomas v. Williams*, 822 F.3d 378, 385 (7th Cir. 2016), despite the fact that they do not fully meet the requirements of our Local Rules.[3] The court nevertheless accepts Defendants' version of the facts where that version is supported by evidence and not properly controverted in Plaintiff's submissions. The court similarly accepts Plaintiff's additional facts [178] to the extent those facts are supported by the record or where

---

response to the summary judgment motion, but the footage relates to a November 23, 2023 incident, note the September 19, 2023, incident at issue in this lawsuit.

[3]      Without setting out an exhaustive list of concerns, the court notes that Plaintiff's response is difficult to follow. The response does not clearly state whether Plaintiff admits or disputes Defendants' asserted facts, and a number of Plaintiff's responses are argumentative or non-responsive. Plaintiff has attached all of his exhibits to his statement of additional facts [178] but the exhibits are voluminous and not clearly organized; they are not numbered sequentially or chronologically. And several of them are not relevant to the claims Plaintiff asserts in this lawsuit.

Plaintiff could properly testify about the matters asserted. *See Sistrunk v. Khan*, 931 F. Supp. 2d 849, 854 (N.D. Ill. 2013); *see also* FED. R. EVID. 602. The facts are, thus, presented as favorably to Plaintiff as the record and LR 56.1 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012).

## II. Relevant Facts

In his third amended complaint, which is the operative complaint in this case,[4] Plaintiff alleges that Defendant Rodriguez retaliated against him for filing grievances complaining about staff misconduct. (Third Amended Compl. [49] ¶ 7.) Specifically, he alleges that on September 19, 2023, during the 7:00 a.m. to 3:00 p.m. shift, Defendant Rodriguez "recklessly took Mr. Watson's cell door off deadlock. Then popped open his cell door [from the control booth] allowing multiple prisoners to enter [his] cell, leaving with his personal property, destroying his television." (*Id.* ¶ 6 (citations omitted).) Plaintiff alleges that Warden Tack "turned a blind eye" to the alleged

---

[4] Plaintiff insists that the fourth amended complaint, filed on April 23, 2025 [109] is the operative complaint in this case. It is not. On June 10, 2024, the court accepted Plaintiff's second amended complaint [16] and allowed him to proceed in his claim that Defendant Rodriguez retaliated against him in violation of the First Amendment in connection with a September 2023, incident at Dixon. (Order [22] at 2 (stating that "[Plaintiff's] allegations are sufficient to state a claim against Officer Rodriguez (in connection with the September 2023, incident described at page 15 of the amended complaint) but no others").) The court dismissed all other claims and Defendants (including a number of unknown Doe Defendants). (*Id.*)

Later, on October 23, 2024, the court allowed Plaintiff to submit a third amended complaint, which named, as Defendants, Sarah Rodriguez, Andrea Tack, and an unknown John Doe. (Third Amended Compl. [49].) Several months later, on March 20, 2025, the court granted Plaintiff's request to file a fourth amended complaint by April 30, 2025, in order "to name/identify any John Doe individuals," noting that this order "[a]ssum[ed] that Defendant will promptly identify the additional John Doe individuals." (Order [86] at 1.) In fact, Defendant had already done so; on March 14, 2025, Defendant had produced a roll call list that specifically identified the control booth officer whose identity Plaintiff claimed he needed. (*See* Defendants' Reply [183] at 4; *see also* Ex. 1, Roster List [182-1] at 1–7.) The court confirmed the deadline five days later, stating in a March 25, 2025 order that "Plaintiff has leave to file his amended complaint, *naming a single additional Defendant,* no later than April 30, 2025." (Minute Order [89] (emphasis added).) The proposed fourth amended complaint [109], filed on April 23, 2025, did not identify the purportedly unknown John Doe Defendant (it appears Plaintiff has settled on Defendant Rodriguez as the control room officer who allegedly opened his cell door on September 19, 2023, allowing theft). Instead of naming a single new Defendant, Plaintiff attempts to raise a variety of new claims. Plaintiff is expected to comply with court orders, like any other litigant. The fourth amended complaint is stricken.

retaliation.  (*Id.* ¶ 11.)

Defendant Rodriguez has been employed by the Illinois Department of Corrections ("IDOC") for the past nine years, and has been employed at Dixon Correctional Center ("Dixon") for that entire time.  (Rodriguez Decl. [165-12] ¶ 1.)  Defendant Tack has been employed as the Warden of Dixon since November 2023.  (Tack Decl. [165-13] ¶ 1.)

Defendant Rodriguez provided her account of the September 19, 2023 incident in a sworn declaration.  Rodriguez states, in that declaration, that she never intentionally propped open Plaintiff's cell at Dixon;  she was unaware that Plaintiff had filed grievances against her until after the filing of this lawsuit; she did put Plaintiff's cell on deadlock on September 19, 2023 as he requested, and no one reported to her that property had been stolen from Plaintiff's cell (Cell 48 in Housing Unit 43) that day; she has had no communication with Plaintiff since learning of the lawsuit; and Cell 48 cannot be seen from the control booth in Housing Unit 43.  Defendant Rodriguez notes, in addition, that the control booth is not the only way that a cell door can be opened; she asserts that many individuals in custody learn how to manipulate locks while in prison.  (Rodriguez Decl. [165-12] ¶¶ 6–10.)

Defendant Tack has also submitted a Declaration.  She explains there that she has no recollection of any personal conversation with Plaintiff in which he reported that a control officer had refused his request that his cell be placed on deadlock.  Nor was she aware of he matter by way of a grievance; Warden Tack does not see a majority of grievances, as clinical supervisors and the administrative warden have signature authority on her behalf.  Warden Tack herself, and those persons who sign grievances on her behalf, are not required to investigate grievances by reviewing security camera footage.  She noted, further, that cell doors at Dixon are always supposed to be secured, regardless of whether an individual is inside or outside of his cell. Warden Tack confirmed, further, that the control booth in Housing Unit 43 is not in eyesight of Housing Unit 43, cell 48.  (Tack Decl. [165-13] ¶¶ 2–8.)

Plaintiff filed a grievance about the September 19, 2023, incident on Septeber 25, 2023.

4

(Grievance [165-14] at 3.) Grievance Officer B. Wells denied the grievance, noting that Officer Rodriguez had asserted that she had put Plaintiff's cell on deadlock when he left, and she was unaware that a theft had occurred, as Plaintiff did not report it to her. (*Id.* at 1–3.) The Administrative Review Board affirmed denial of the grievance. The affirmance was signed by Acting Director Latoya Hughes—not Defendant Tack. (*Id.*)

**DISCUSSION**

Two motions are before the court: Defendants have moved for summary judgment, but also seek sanctions against Plaintiff for discovery misconduct. The issues in these motions are related, and the court turns, first, to the motion for sanctions.

**I.  Defendants' Motion for Sanctions [140]**

In this motion Defendants note the following troubling circumstances: Plaintiff himself wrote and submitted Declarations from various witnesses who, as is now clear, either did not sign these Declarations or did not observe the relevant events. Defendant had a transactional relationship with some of these witnesses and with other persons in custody (a relationship he falsely denied). And Plaintiff attempted to excuse his failure to provide timely discovery responses on the basis of a frivolous claim that he did not have access to pens and therefore could not answer basic discovery questions in writing. The court addresses these issues below.

**A. Plaintiff's Transactional Relationships with his Witnesses and Individuals in Custody**

Defendants contend that Plaintiff perjured himself in his discovery responses to interrogatories. Specifically, when Defendants asked whether he was engaged in any business or transactions with other individuals in custody, for services he rendered to them while incarcerated, Plaintiff responded "no." (Mot. for Sanctions [140] at 8–11.) But, as Defendants have demonstrated, multiple sources contradict that response, including the deposition testimony of Robert Freeland (discussed in more detail below), Plaintiff's own statements/testimony about his affiliation with the "New Outreach Level Assistant Program" (also discussed below) and a

statement he made in connection with a September 20, 2023, incident at Dixon, in which he asserted that he represented other inmates. (*See id.* at. 8–9.) Plaintiff is neither a licensed nor practicing attorney but purported to provide various legal services to other individuals in custody. (*See id.* at 9.)

In response, Plaintiff offers the following convoluted explanation: "The reason why Mr. Watson in good faith answered and maintained his no response to Defendants' interrogatory question that pertains to an alleged contingency fee agreement, as a reciprocal business transactional relationship between Mr. Watson personally and his witnesses in this case is non existent." (Opp'n [145] ¶ 13.) Plaintiff contends that he is not engaged in a business relationship because he receives no monetary compensation in connection with the New Outreach Level Assistance Program. (*Id.*)

The notion that Plaintiff is not being paid by other inmates for his services is flatly inconsistent with the evidence Defendants have presented. Defendants deposed Plaintiff and obtained his trust fund statements (for the period covering January 1, 2022, to September 25, 2024) in connection with the motion for sanctions. (*See* Pl. Dep. [146-1]; Pl. Trust Fund Statements [146-2].) During his deposition, Plaintiff Nolan Watson described his "affiliation" with a "nonprofit" group called "New Outreach Level Assist Network" (which, notably, uses the acronym NOLAN) that assists other inmates in filing lawsuits. (Pl. Dep. [146-1] at 9–12.) Plaintiff testified that he does not have a "compensation agreement" with the individuals he assists and does not request a contingency fee. (*Id.* at 12:4–8; 47:11–19.) But documents produced by Defendants show that Plaintiff did indeed have a contractual contingency fee agreement with other inmates for services rendered in a case filed in state court. (New Outreach Level Assistance Network (NOLAN) Contractual Agreement [140-2].) Under the terms of that agreement, a copy of which is attached to Defendants' motion for sanctions, the many inmates who signed it would pay $1,000 to the organization from any future recovery in return for services from NOLAN that include "paralegal advocacy," "personal phone calls," "typing services," and "set up and manag[e]ment"

6

of bank accounts and email addresses.[5]  Plaintiff also claims he does not run the organization, which he describes as a "a group of us," for which his brother Leon Watson is the CFO, and which does no more than "facilitate[s] the advocacy of different issues[.]"  (Pl. Dep. [146-1] at 48:20–22; 49:6–24.)  Plaintiff testified that his brother does not send him any money and that Plaintiff "get[s] money from Veteran's benefits."  (*Id.* at 49:25–50:2.)  But his statement that his brother does not send him any money is inconsistent with his trust fund statements, which show that he did in fact receive payments from his brother, NOLAN's "CFO."  (Pl. Trust Fund Statements [146-2].)

### B. Declarations of Marty Blackmon, Robert Freeland, Labrandon Johnson and Byron Boykins

In further support of their request for sanctions, Defendants contend that Plaintiff provided "frivolous and malicious, self-drafted declarations, which could not be corroborated by the witness' testimony[.]" (Mot. for Sanctions [140] at 11.)  In addition, Defendants assert, Plaintiff attempted to interfere with the depositions of those witnesses on July 11, 2025.  (*Id.*)  Specifically, declarations of various individuals in custody (Marty Blackmon, Robert Freeland, Labrandon Johnson, and Byron Boykins) were submitted in support of Plaintiff's third amended complaint.  In these declarations, Plaintiff's witnesses claimed to have observed the events of September 19, 2023, giving rise to this lawsuit.  Each of the declarations was handwritten by Plaintiff Watson, who left blank spaces for the witnesses to insert their names and signatures.[6]

---

[5]      The "New Outreach Level Assistance Network (NOLAN) Contractual Agreement," obviously handwritten by Plaintiff Nolan Watson, is signed by Plaintiff and more than a dozen prisoners, including two who gave declarations in support of Plaintiff in this case.  The terms of the Agreement require that signatories will "pay the fee of $1,000, to the New Outreach Level Assistance Network, care of Leon Watson, Chief Financial Officer," for NOLAN's services, and that "[e]ach client fee is to be [sic] directly from their monetary damages awarded in their civil suits against GTL and IDOC, 22 CH 2 and 22 LA 25 [that is, cases in the law division or chancery division in state court]; to be issued directly from [the state court] Defendants, at the same instance damage awards are issued to the above Plaintiffs." The Agreement lists the services to be provided as "paralegal advocacy; set up and manage bank accounts; set up and manage e-mail accounts; make personal phone calls; typing services; and most specific request for services." The Agreement states, further, that persons signing it are doing so under penalties of perjury and cites 735 ILCS 5/1-109, the statute that establishes perjury as a felony under Illinois law.

[6]   The Declaration of Robert Freeland reads, in its entirety, as follows:

7

> I, Robert Freeland, declare that on September 19, 2023, I witnessed inmates Johnson from 43-Cell 54, Porter from 43-Cell 56, and Clark from 43-Cell 31, enter the cell of Mr. Watson 48. They stole all the food items from his property box, and broke his television by smashing it in. The female bubble officer Mrs. Rodriguez popped Mr. Watson's cell door to allow the above inmates entry. She also allowed other inmates to keep their cell doors open to block the view of the video camera pointed at cell 48. Also Mr. Edwards from 43-Cell 49. I declare that the above statement is true and correct. I understand that making a false statement is perjury, and has penalties prescribed by law pursuant to 735 ILCS 5/1-109.

([49] at 37.)

The Declaration of Marty Blackmon reads, in its entirety, as follows:

> I, Marty Blackmon, declare that each time Mr. Watson has left housing unit 43, on May 11, 2023, May 31, 2023, July 31, 2023, Sept. 19, 2023, and Nov. 23, 2023. The bubble control officers on each respective date, opened his cell door while he was gone, allowing other inmates to enter his cell to steal his property and destroy his television. The officers also allow prisoners to use their cell doors to block the view of the cameras, which allows the transactions to occur creating unsafe conditions for all inmates. I declare that the above statement is true and correct. I understand that making a false statement is perjury, and has penalties prescribed by law pursuant to 28 U.S.C. section 1746, 18 U.S.C. section 1621, or 735 ILCS 5/1-109.

(*Id.* at 38.)

The Declaration of Labrandon Johnson reads, in its entirety, as follows:

> I, Labrandon Johnson, declare that on Sept. 19, 2023, and Nov. 23, 2023, I witnessed inmate Nolan Watson leave housing unit 43, and while he was gone the control officers opened his cell door each time, giving other prisoners full access to all his personal property. On Sept. 19, 2023, after returning from his call pass and discovery his property was gone, he immediately told control Officer Rodriguez #8407, she argued with him then gave Mr. Watson her name and badge number, telling him to file a grievance. I am willing to testify. I declare that the above statement is true and correct. I understand that making a false statement is perjury, and has penalties prescribed by law pursuant to 28 U.S.C. section 1746, 18 U.S.C. section 1621, or 735 ILCS 5/1-109.

(*Id.* at 39.)

The Declaration of Byron Boykins reads, in its entirety, as follows:

> I, Byron Boykins, declare that on Sept. 19, 2023, I witnessed Nolan Watson leave cell house 43 around 12:55 pm on a call pass. At the time he left, his cell door 48 was closed shut, after he left the building somehow his cell door was popped open by Officer Rodriguez. Thereafter several inmates entered Mr. Watson's cell, and stole a lot of his commissary items, including the transgender in cell 50, and

On July 11, 2025, Defendants conducted the depositions of Blackmon, Johnson, and Freeland[7] for purposes of ascertaining the validity of the Declarations of each witness (and their recollection of the events they witnessed). (Blackmon Dep. [140-3]; Freeland Dep. [140-4]; Johnson Dep. [140-5].)

Blackmon was the first witness to be deposed. Early in the deposition, defense counsel asked Blackmon whether Plaintiff was helping with Blackmon's own two state court cases, and Plaintiff interjected by answering the question. (Blackmon Dep. [140-3] at 13:18–21.) Defense counsel warned Plaintiff that "you don't get to talk right now. I'm asking questions[.]" (*Id.* at 13:22–23.) Counsel then proceeded to question Blackmon about the declaration, asking whether he recalled writing his name, the date, and signature on the document; Blackmon testified that he did not write his name on the declaration, nor did he sign it. (*Id.* at 15:14–24.) When asked whether he had any personal knowledge of the contents of his declaration, Blackmon responded: "To a degree. Now that I'm reading, to a degree, what is described." (*Id.* at 16:9–10.) Then, when asked whether he had "personally witness[ed] any of the events of May 11th, May 31st, July 31st, September 19th, and November 23rd of 2023," Blackmon testified that he was "familiar with the incident after the fact, *just off unit chatter* or whatever." (*Id.* at 16:14–25 (emphasis added).) Blackmon acknowledged that he "didn't actually personally witness . . . these things as

---

another inmate from cell 49. Which should be substantiated by surveillance video footage, from the camera aimed at cell 48. I later learned that Mr. Watson's TV was smashed. I also aver that staff members on first and second shift allow inmates from cells 46, 47, 53, and 54, leave their cell doors open blocking the video cameras view of the hallways on a daily basis, making Mr. Watson's cell be vulnerable for theft and attack. I will testify if called upon. I declare that the above statement is true and correct. I understand that making a false statement is perjury, and has penalties prescribed by law pursuant to 735 ILCS 5/1-109.

(*Id.* at 40.)

[7] Defendants did not take inmate Boykins's deposition. It appears he was not housed at Dixon on the date when other witnesses were deposed. (Opp'n [145] at 1.) And Plaintiff does not appear to have submitted Boykins's declaration in opposition to Defendants' motion for summary judgment. (*See* Exhibits Index [177] at 1–2; Exhibits Index [178] at 1–2.)

they happened." (*Id.* 17:1–6.)  Defense counsel then asked Blackmon, "the reason why you're here today is because, obviously, your name is on [the declaration], right?"  (*Id.* at 20:18–20.) Blackmon agreed, and explained that he did know why he was included as a purported witness: "Okay.  But the, the only thing that I can reasonably think of is if those—if these—obviously, because it's in record, but maybe somebody that was over there wrote my name because they thought that I would be a part of it.  Who knows?  I can't, can't say."  (*Id.* at 20:22–21:2.)

Freeland's deposition proceeded similarly, and Plaintiff attempted to advise Freeland concerning her[8] answers to defense counsel's questions.  Defense counsel, frustrated, warned, "[n]o, we're not going to do this.  Hold on.  Mr. Watson, you do not get to advise Ms. Freeland on how she answers."  (Freeland Dep. [140-4] at 14:1–3.)  Plaintiff stated that he was "not advising Ms. Freeland" and that she had "looked at [him]."  (*Id.* at 14:4–5.)  Shortly after, evidently in response to more comments from Mr. Watson, defense counsel stopped and asked the court reporter whether he was making a record of "what Mr. Watson is saying as well?"  (*Id.* at 15:9– 11.)   The court reporter responded, "I am, yes, if I can catch it.  He is talking under his breath." (*Id.* at 15:12–13.)  At this point, defense counsel asked Plaintiff "one more time . . . to refrain from answering anything or making any comments during my deposition.  If this persists, I will put a pause on this deposition and call Judge Pallmeyer to resolve this situation.  Mr. Watson, I had clearly stated at the beginning of this deposition, you are not to be making statements that may lead the witness into answering a question.  I would ask you one more time to please refrain from doing this.  Is that understood, Mr. Watson?"  (*Id.* at 15:14–24.)

Freeland testified that Plaintiff wrote her declaration and she signed it.  (*Id.* at 11:7–9.) When asked whether the contents of the declaration were based on her personal knowledge, she replied, "I witness and I was on the same side as him.  And they put his commissary in my cell, and I confronted him after the fact that they took it out of my cell."  (*Id.* at 11:16–19.)  She testified

---

[8]        Freeland is transgender.  (Freeland Dep. [140-4] at 9:1.)

further that "[t]he CO popped his door, and they went in there and took everything, and they broke his TV off the side of the middle bed." (*Id.* at 11:21–23.) Freeland was unaware where her declaration would be filed; she said, "I just signed it. He had me sign it, and I just signed it. He didn't tell me where—what county, what district, or none of that. I just signed it because I was his witness and saying I saw them going into [*sic*] cell, taking his stuff, and I'm not going to sit there and beat around the bush and then lie to a person that I kick it with." (*Id.* at 15:2–8.) She also testified that she had witnessed various inmates enter Plaintiff's cell on September 19, 2023, and steal food items at a time when "they had all the doors open, and they blocking the cameras." (*Id.* at 21:13–17; 25:6–8.) Freeland acknowledged that Plaintiff gives her advice concerning legal issues—advice for which she compensates him at times, with commissary items or coffee. (*Id.* at 16:18–24; 17:13–15; 18:1–7.)

Plaintiff continued his disruptive behavior during Johnson's deposition, attempting to lead the witness. At one point during Johnson's testimony, the court reporter recorded the words, "Mr. Watson grunts." (Johnson Dep. [140-5] at 19:12.) Defense counsel warned, "Mr. Watson, again, I'm asking you one more time, no grunts, no help—I'm asking the questions. I am seriously two inches away from calling Judge Pallmeyer and holding you in contempt. Is that understood?" (*Id.* at 19:13–17.) In response, Plaintiff stated, "[h]ey, hey. I'm just clearing my throat. I can't do that?" (*Id.* at 19:18–19.) Defense counsel stated, "[n]o, no, no, Mr. Watson, we're not going to do that." (*Id.* at 19:20–21.)

Johnson's testimony confirms that Plaintiff was instrumental in preparing his declaration, as well. Johnson explained that he signed the declaration without reviewing its contents, and that "[Plaintiff] never told me what it was." (*Id.* at 8:14–20.) Defense counsel asked Johnson, "do you see, on the part, the main paragraph, it says that you declare that on September 19, 2023, and November 23, 2023, you witnessed inmate Nolan Watson leaving house at Unit 43. And while he was gone, the control officers opened his door each time, giving other prisoners full access to his personal property?" (*Id.* at 9:16–22.) In response, Johnson asserted that he had observed

11

the incident giving rise to this case, but his testimony was less than convincing: "Yes, sir. My bubble—hold on. Wait, though. Yes, that—well, that did happen. That did happen. Well, she had to—yeah. Well, yeah, yeah, because she the only person that was in the bubble. Yeah, that, that is true. Yeah, that's true. That is true because she was the only person that was in the bubble that could open his door. Yeah, that's true." (*Id.* at 9:23–10:5.) Asked, "who do you mean by she," Johnson stated, "Ms. Rodriguez. Yeah. Ms. Rodriguez." (*Id.* at 10:6–7.)

Defense counsel then asked Johnson: "On September 19, 2023, did you personally notice Officer Rodriguez open a cell, or were you in the hallway where your cell is and saw his cell door get opened?" (*Id.* at 11:13–16.) In response, Johnson stated "[y]eah, yeah, that's what happened, yeah. Personally, I was in the hallway and saw his cell door popped open, you know what I'm saying? Because she's the only person that could—that could pop the door because nobody else popped the door." (*Id.* at 11:17–21.) Defense counsel asked specifically, "you didn't actually see her pop it, but you assume that it was her because you saw his cell door get opened, right?" (*Id.* at 11:22–24.) In response, Johnson stated "yeah." (*Id.* at 11:25.)

Later in the deposition, Johnson made a startling admission: that he himself was among the inmates who entered Plaintiff's cell on September 19, 2023 to take Plaintiff's commissary items while Plaintiff was out on a hall pass.[9] (*Id.* at 13:20–24.) Yet despite his own involvement in the incident, Johnson testified that he signed the declaration because Plaintiff asked him to sign it and that he was unaware that he was signing a Declaration related to any particular date. (*Id.* at 21:2–22:2.)

Plaintiff offers no effective response to these challenges to the credibility of his evidence. He merely states that the "declarations were drafted by [him] for the benefit of the witnesses and the Court." (Opp'n [145] at 1.) As noted, he did not offer the Boykins declaration in his summary judgment opposition, and has now withdrawn the declaration signed by Blackmon, who he

_____

[9]     In her deposition, R. Freeland had confirmed that a prisoner named Johnson was among those who had been involved in the incident. (Freeland Dep. [140-4] at 21:13–17.)

concedes never personally witnessed the event. He asserts that he drafted Freeland's declaration because she has arthritis and that he drafted Johnson's declaration because Johnson has only a fourth-grade education. (*Id.* ¶ 1.) But he provides no explanation or excuse for his disruptive behavior during the depositions. Perhaps most significantly, he side-steps the discrepancies between the statements in the declarations and the deposition testimony, glossing over the fact that *none* of the witnesses that were deposed testified that they observed Defendant Rodriguez (or any other officer for that matter) open his cell door on September 19, 2023.

### C. Plaintiff's Representations Concerning his Writing Tools and his Ability to Respond to Defendants' Interrogatories

A final example of what Defendants believe is sanctionable behavior arises from Plaintiff's "ostentatious misrepresentations to this Court concerning his limitation of writing tools"— evidence, Defendants contend, of "Plaintiff's disingenuous attempts to conceal during the discovery process." (Mot. for Sanctions [140] at 13.) In a July 10, 2025 conference, Defendants note, Plaintiff blamed his inability to fully answer Defendant Rodriguez's interrogatories on lack of access to adequate pens. (*Id.*) The court agrees with Defendants that this claim of inability is frivolous. At the same time that Plaintiff claimed his lack of writing equipment rendered him unable to respond to discovery, Plaintiff was able to file more than 30 handwritten motions. For this reason, the court denied Plaintiff's "Motion to Take Judicial Notice" [122] of the poor quality of his pens on July 31, 2025. (Minute Order [136].) Four days later, Plaintiff provided his interrogatory responses, demonstrating, in Defendants' view, that without a court order, "Plaintiff would have likely continued to mislead [defense counsel], and this Court, on Plaintiff's lack of access to pens." (Mot. for Sanctions [140] at 13.)

Plaintiff's response to this observation is nothing more than a double-down: he asserts that at the time of the court's July 10, 2025, hearing, he did not have access to pens, and when he did, the pens were "ineffectual." (Opp'n [145] ¶ 11.) The court rejects this contention for the same reason it did earlier. The court concurs, further, with Defendant's observations that Plaintiff

13

has repeatedly failed to resolve discovery disputes in good faith, instead "ignoring the Court's requests while continuously running to the Court's docket for relief while failing to meet-and-confer with [defense counsel], further ballooning this docket." (Reply [146] at 9.)

A court has the inherent power to sanction misconduct in the litigation before it, *Salmeron v. Enter. Recovery Sys., Inc.*, 579 F.3d 787, 793 (7th Cir. 2009), and will do so when a litigant has willfully abused the judicial process or otherwise conducted litigation in bad faith. *Id.* Similarly, discovery sanctions are appropriate where a party displays willfulness, bad faith, or fault. *Am. Nat'l Bank and Tr. Co. of Chi. v. Equitable Life Assur. Soc. of the U.S.*, 406 F.3d 867, 877 (7th Cir. 2005). The court here is troubled both by Plaintiff's conduct and his lack of candor concerning the conduct. Having carefully reviewed Defendants' motion for sanctions and the related documentation, the court concludes that Plaintiff Watson has willfully abused/manipulated the judicial process, has been dishonest concerning his dealings with other "witness" inmates, and appears to have conducted this litigation in bad faith. Plaintiff has continued to engage in bad faith by failing to provide any meaningful explanation for his conduct and *continuing to engage* in the same/similar conduct in connection with the summary judgment motion.[10] Plaintiff admits to assisting other inmates with the filing of their lawsuits. To the extent that assistance prompts other inmates to follow his lead in all respects, it may have unappealing consequences.[11]

---

[10] As noted above, Plaintiff's summary judgment materials—filed well after Defendants' motion for sanctions called out inconsistencies in the declarations and testimony of Blackmon, Freeland and Johnson—nevertheless rely on those materials in opposition to summary judgment. In addition, Plaintiff has submitted a new/additional declaration from Inmate Johnson in connection with the September 19, 2023 incident, one that appears to also have been written by Plaintiff to fix or circumvent the inconsistencies or ambiguities with Johnson's deposition testimony. (*See* Johnson Second Decl. [155].) The court declines to consider this additional declaration.

[11] On this score, the court notes that the complaint filed in *Parker v. Hughes, et al.*, No. 25 C 50358 (N.D. Ill.) (Johnston, J.) by Plaintiff Gabriel Parker was identical to the complaint filed in another case filed by Nolan Watson, *Watson v. Hughes*, No. 25 C 50049. Judge Johnston of this court dismissed Plaintiff Parker's "copycat" complaint (and an amended complaint, also prepared by Nolan Watson) without prejudice. (*See* Order [10] and Order [14] in *Parker*, No. 23 C 50358.) The court warned Plaintiff Parker that "Plaintiff's signature on any complaint he submits is a certification that his factual allegations accurately and truthfully reflect his own personal

14

The court concludes that sanctions are appropriate. *See e.g.*, *Montano v. City of* Chicago, 535 F.3d 558, 563 (7th Cir. 2008). Defendants' motion [140] is granted. The court will impose sanctions by way of referring Plaintiff to the Executive Committee with a recommendation that it impose limitations on his ability to file in this court. Additionally, to the extent Plaintiff relies upon the declarations and/or depositions of Blackmon, Freeland, and Johnson in opposing summary judgment, the court disregards those materials and will not consider them in connection with the pending summary judgment motion. Defendants are free to seek reimbursement for the costs incurred in connection with the filing of their motion for sanctions by submitting a Bill of Costs.

## II.     Defendants' Motion for Summary Judgment [164]

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986); *see also Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). In ruling on a motion for summary judgment, the court must consider the record as a whole, in the light most favorable to the non-moving party, and draw all reasonable inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255.

The parties seeking summary judgment have the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010). If the moving parties demonstrate the absence of a disputed issue of material fact, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012).

experiences." (Order [10] in *Parker*, No. 23 C 50358.) Parker's second amended complaint (also handwritten by Plaintiff Nolan Watson) has survived initial review. The court also observes that Plaintiff Watson's summary judgment materials *in this case* include a Declaration from Gabriel Parker. (*See* Parker Decl. [178] at 184.)

The non-movant must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Hannemann v. S. Door Cnty. Sch. Dist.*, 673 F.3d 746, 751 (7th Cir. 2012).

### A. Plaintiff's First Amendment Retaliation Claim against Defendant Rodriguez

Plaintiff claims Defendant Rodriguez retaliated against him for First Amendment activity by knowingly allowing other inmates to enter his cell and steal/destroy his personal property. To survive summary judgment on this claim, Plaintiff must present evidence permitting a reasonable jury to conclude that: (1) he engaged in activity protected under the First Amendment; (2) he suffered a deprivation that would likely deter future First Amendment activity; and (3) his First Amendment activity was at least a motivating factor in Defendants' decisions. *See Perez v. Fenoglio,* 792 F.3d 768, 783 (7th Cir. 2015) (citing *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009)). Plaintiff has not met this burden.

His filing of grievances does constitute protected activity under the First Amendment, *id.*, and the court will assume for purposes of this ruling that the alleged theft/destruction of personal property from his cell is sufficient to show he suffered a deprivation likely to deter future protected activity. But Plaintiff's claim fails on the third (causation) element. As explained earlier, Defendant Rodriguez states in her declaration that she never intentionally popped Plaintiff's cell door open. She in fact put Plaintiff's call on deadlock on September 19, 2023, and no one reported to her that property was stolen from Plaintiff's cell, in Housing Unit 43, cell 48, on that day. She observed that Cell 48 in Housing Unit 43 is not within view from the control booth, and that action from the control booth is not the only way that a cell door could be opened; according to Rodriguez, many individuals in custody learn how to manipulate prison locks. (Rodriguez Decl. [165-12] ¶¶ 6–10.) Most important, Rodriguez states that she was unaware that Plaintiff had filed any grievances against her until after the filing of this lawsuit. And it is no wonder that she was unaware: in the several grievances Plaintiff submitted in opposition to Defendants' motion for summary judgment, Defendant Rodriguez's name appears for the first time in the grievance relating to the September

16

19, 2023 itself.  (Grievances [178] at 87–116.)  If Plaintiff had never before filed a grievance against her, Defendant Rodriguez's alleged misconduct could not be a function of retaliation.  *See Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 915 (7th Cir. 2022) ("Knowledge of the protected activity is necessary to show causation for a retaliation claim.").

Plaintiff offers no competent evidence of a retaliatory motive on the part of Defendant Rodriguez.  For the reasons explained earlier, the court will not consider the declarations of inmates Freeland, Blackmon, and Johnson, nor the new/additional declaration of inmate Johnson (*see* Second Johnson Decl. [178] at 83), but the court notes that none of Plaintiff's witnesses had competent evidence that Defendant Rodriguez actually opened Plaintiff's cell door. Nor do they shed any light on Defendant Rodriguez's purported motivation for doing so.  Plaintiff now asserts that he had a conversation with Defendant Rodriguez after the complained-of incident, at which time she told him to stop filing grievances (*see* Watson Decl. [178] at 50); but at his deposition he testified that when he confronted Defendant Rodriguez on the date of the theft, she responded by giving him her name and badge number.  (Pl. Dep. [146-1] at 19:8–22.)  He said nothing in the deposition about any mention of previous grievances, and surely could have testified about the comment he now claims to remember.  It is curious, further, that when asked, "Does Sarah Rodriguez know who you are?", he responded, "I believe *she does now*, yeah."  (*Id.* at 21:8–9 (emphasis added).)[12]  Defendant Rodriguez is entitled to summary judgment.

### B. Claim Against Defendant Tack for "Acquiescing" in or "Turning a Blind Eye" to the Complained-of Retaliation

Plaintiff's claim against Defendant Tack requires only brief discussion.  Any claim against Defendant Tack for "acquiescing" in or "turning a blind eye" to the complained-of retaliation fails

---

[12]     Defense counsel did not specifically ask, "Did Ms. Rodriguez say anything about your prior grievances?" so the court will not invoke the "sham affidavit" rule.  *See generally James v. Hale*, 959 F.3d 307, 317 (7th Cir. 2020) ("In this circuit the sham-affidavit rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony.").  But it appears most unlikely that Plaintiff failed to mention this merely because he was not asked about it.

because Plaintiff has not established his claim of retaliation. And if he could, the court would nevertheless grant summary judgment in favor of Defendant Tack because there is no evidence of Tack's personal involvement in the complained-of conduct, as required for individual liability under § 1983. *See Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017). Defendant Tack was not employed as the Warden of Dixon until *November 2023*—some two months *after* the September 19, 2023, incident. (Tack Decl. [165-13] ¶ 1.) Defendant Tack's name/signature does not appear on any of the grievance paperwork, and she has submitted a declaration stating that she has no recollection of any personal conversation with Plaintiff in which he complained that a control officer failed to place his cell on deadlock. (*See id.*)

Defendant Tack is entitled to summary judgment.

## CONCLUSION

Defendants' motion for sanctions [140] is granted. Defendants' motion for summary judgment [164] is granted. Final judgment shall enter. If Plaintiff wishes to appeal, he must file a notice of appeal with this court within thirty days of the entry of judgment. *See* FED. R. APP. P. 4(a)(1). If Plaintiff appeals, he will be liable for the $605.00 appellate filing fee regardless of the appeal's outcome. *See Evans v. Ill. Dep't of Corr.*, 150 F.3d 810, 812 (7th Cir. 1998). Additionally, if the appeal is found to be non-meritorious, Plaintiff could be assessed a "strike" under 28 U.S.C. § 1915(g).

ENTER:

Date: March 16, 2026

_____
REBECCA R. PALLMEYER
United States District Judge

18